Anthony N. MATTEO, Appellant

v.

**SUPERINTENDENT, SCI ALBION; The District Attorney of The County of Chester; The Attorney General of The State of Pennsylvania**

No. 96–2115.

United States Court of Appeals, Third Circuit.

Argued Jan. 30, 1998.

Argued En Banc Nov. 23, 1998.

Decided March 24, 1999.

Walter M. Phillips, Jr. (Argued), Hoyle, Morris & Kerr, Philadelphia, PA, for Appellant.

Stuart Suss (Argued), Nicholas J. Casenta, Jr., Office of District Attorney, West Chester, PA, for Appellees, The District Attorney of the County of Chester; The Attorney General of the Commonwealth of Pennsylvania.

James S. Liebman (Argued), Columbia University School of Law, New York, New York; Matthew C. Lawry, Defender Association of Philadelphia, Federal Court Division, Philadelphia, Pennsylvania, for Federal Defender Organization Amici Curiae Appellants, Richard Couglin, Esq., Federal Public Defender, District of New Jersey; James V. Wade, Esq., Federal Public Defender, Middle District of Pennsylvania; Shelley Stark, Esq., Federal Public Defender, Western District of Pennsylvania; Penny Marshall, Esq., Assistant Federal Public Defender, District of Delaware; and Maureen Kearney Rowley, Chief Federal Defender, Federal Court Division, Defender Association of Philadelphia.

Peter J. Gardner (Argued), Donna G. Zucker, Office of District Attorney, Philadelphia, Pennsylvania, for Amici Curiae Appellees, Attorney General, State of Delaware; Attorney General, State of New Jersey; Attorney General, Commonwealth of Pennsylvania; District Attorney, Allegheny County; and District Attorney, Philadelphia County.

Argued Jan. 30, 1998.

Before: MANSMANN, COWEN and RENDELL, Circuit Judges

Argued En Banc Nov. 23, 1998.

Before: BECKER, Chief Judge, SLOVITER, STAPLETON, GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH, LEWIS, McKEE, RENDELL and COWEN, Circuit Judges

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Like our sister courts of appeals, we are asked to determine the appropriate standard of review governing petitions for a writ of habeas corpus. Anthony Matteo seeks habeas relief from his state convictions for first degree murder, robbery, theft, and possession of marijuana, contending the Commonwealth of Pennsylvania violated his Sixth Amendment right to counsel by using incriminating statements he made in two telephone conversations from prison to an outside informant. In evaluating Matteo's petition, the en banc court must interpret the standard of review provision incorporated into 28 U.S.C. § 2254(d) by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which revised the standard of review for habeas corpus petitions. We hold that the revised statute mandates a two-part inquiry: first, the federal court must inquire whether the state court decision was "contrary to" clearly established federal law, as determined by the Supreme Court of the United States; second, if it was not, the federal court must evaluate whether the state court judgment rests upon an objectively unreasonable application of clearly established Supreme Court jurisprudence. Applying this analysis, we will affirm the District Court's dismissal of Matteo's habeas petition.

## I. Background

### A. *Facts*

In September 1988, Anthony Matteo was convicted of first degree murder, robbery, theft, and possession of marijuana and subsequently sentenced to life imprisonment on the murder conviction and twenty years' consecutive probation on the robbery conviction. The facts underlying Matteo's convictions were aptly summarized in the opinion of the Court of Common Pleas of Chester County, Pennsylvania:

> On January 17, 1988, Patrick Calandriello was found dead in the trunk of his Cadillac which was parked in the North parking lot of the Holiday Inn in Lionville, Pennsylvania. Calandriello had been shot in the head with a .22

caliber rifle and stuffed in the trunk of his own car. Although Calandriello had been known to carry large sums of money, usually in large denominations, no money was found on him. Additionally, he was missing both his apartment and his car keys. Investigators also discovered white cat hairs on Calandriello's pants and a sneaker print on the rear bumper of his car.

The story which ended in Calandriello's death and Matteo's conviction commences in September 1987. Edward Beson, a friend of Calandriello's, testified that Calandriello sought Beson's assistance in storing $20,000 worth of stolen golf carts which Calandriello was soon to acquire. Beson learned from Calandriello that Anthony Matteo was going to obtain these stolen golf carts for Calandriello.

Apparently, the first of two "attempts" to obtain the stolen golf carts, in September of 1987 and January 5, 1988, was unsuccessful. At approximately 11:20 a.m. on January 13, 1988, Calandriello telephoned Beson and stated that he was going to pick up Anthony Matteo at Matteo's house and that he, Calandriello, would be carrying $5,000 or $6,000. Another $15,000 was to be left in the care of Calandriello's friend Richard Ross. Calandriello told Beson that he would meet Beson at 2:00 p.m. that afternoon at Denny's Restaurant, but Calandriello never arrived.

Shortly after noon on January 13, 1998, Calandriello did indeed leave $15,-000 in an envelope with Richard Ross at a Roy Rogers Restaurant in Paoli. Calandriello told Ross that he was going to Routes 401 and 113 to pick someone up and that he would return in approximately forty-five minutes to an hour; Matteo's home is nearby this intersection. Ross awaited Calandriello's return for over three hours before he gave up and left the Roy Rogers Restaurant.

Sara Kessock, Calandriello's girlfriend, reported Calandriello missing and an investigation of his disappearance ensued. Eventually, the investigation led to Anthony Matteo, and the police conducted two searches of the Matteo home. The searches revealed the following:

1. In Defendant's room was .22 ammo consistent with the type that killed Calandriello;

2. In Defendant's room were sets of Calandriel lo's car and apartment keys;

3. Under the mattress in Defendant's brother's room was $1,200 in $100 bills;

4. At the Matteo house was a white cat whose h air was consistent with the hairs found on Calandriello's pants;

5. In Defendant's room were sneakers that an F BI expert was "90% to 95% certain" were the sneakers that made the print on Calandriello's car's rear bumper; and

6. Blood was found in the defendant's garage t hat was consistent with Calandriello's and only 3% of the rest of the population.

Crucial testimony was provided by a number of Matteo's friends. First, Timothy Flynn stated that he and the Defendant had gone target shooting on January 10, 1988. Flynn also stated that on the evening of January 13, 1988, the Defendant was carrying a wad of bills and was spending $100 bills.

Next, C. John Stanchina, a longtime friend of the Defendant's, testified that at approximately 2:25 p.m. on January 13, 1988, he picked up the Defendant at the North end parking lot of the Holiday Inn in Lionville. As it would turn out, this was near where Calandriello's frozen body was later discovered.

Finally, Douglas Lubking testified that he had lent the Defendant a .22 rifle in December of 1987. Lubking and the Defendant had been target shooting and Defendant asked Lubking to loan Defendant the rifle so he could practice. Subsequent to his arrest for murder, the

Defendant called Lubking from the Chester County Prison. The Defendant told Lubking that he had hidden Lubking's rifle near the Defendant's home. Defendant asked Lubking to retrieve the .22 rifle and to hide it in Lubking's attic. Defendant also instructed Lubking to tell the police and Defendant's own attorneys that Lubking did not own a .22 rifle. As a bribe, Defendant offered $1,500 worth of cocaine if he would retrieve the gun. As a result of Defendant's instructions, the gun was located by the police on February 1, 1988. It was this same gun which was later identified by Timothy Flynn as the gun with which Defendant had been target shooting on January 10, 1988. This gun was found to be consistent with the type of gun that killed Calandriello.

*Commonwealth v. Matteo*, 409 Pa.Super. 655, 589 A.2d 1175 (1990).

Of particular importance in this appeal are the telephone conversations between Matteo and Lubking that took place after Matteo's arrest. The evidence in the record shows that on January 28, 1988, Matteo called Lubking from prison and asked him to retrieve the rifle that Matteo had borrowed from Lubking shortly before Calandriello's murder. Matteo told Lubking that he had nothing to do with Patrick Calandriello's murder, but that he had hidden the rifle so that Lubking would not become a suspect. Lubking responded that he wanted to consult with an attorney before deciding what to do. He told Matteo to call him back the following evening at 8:30 p.m.

The next morning, January 29, 1988, Lubking met with an attorney, who advised him to inform the Chester County District Attorney's office of his conversation with Matteo. Lubking did so, meeting with Chester County detectives that afternoon. During that meeting, Lubking provided written consent to let police intercept and record the anticipated phone call from Matteo that night. The detectives instructed Lubking that he was not to ask questions or otherwise elicit information from Matteo.

As expected, Matteo called Lubking around 8:30 that evening. The police recorded the conversation. At trial, Lubking identified the recorded voices as his and Matteo's. The conversation, which need not be reproduced in full here, consists mainly of Matteo instructing Lubking on how to retrieve the rifle as Lubking provides brief acknowledgments of understanding:

MATTEO: I got rid of that [the rifle], and I put it outside. Any damage that the weather has done to it, I will replace. Okay?

LUBKING: Okay.

MATTEO: If it has. So I just don't want you getting nervous too. So if anybody asks, you don't have a .22 and you didn't—eh-eh, what do you call. All right?

LUBKING: Uh-huh.

.     .     .     .     .

MATTEO: Ahm—ah—when are you able to go g et it, from when I tell you to get it.

LUBKING: As soon as possible. I want this thing—I want it here.

MATTEO: Can you leave right now to get it?

LUBKING: Yeah.

MATTEO: Okay. Now I'm going to tell you where it's at, but you got to leave this instant to get it.... And once you get it, clean it up and just like, you know, put it away in your attic or something.

Matteo then suggested that Lubking fabricate a pretense to drop something off at Matteo's house, so that Lubking could retrieve the rifle while there. At this point in the conversation, Lubking's extremely brief responses—he had been instructed not to elicit information—aroused Matteo's suspicion:

MATTEO: What's the matter? Why do you seem so hesitant?

LUBKING: No. I'm not hesitant. I'm just—

MATTEO: You just make me nervous.

LUBKING: Sorry.

.　　.　　.　　.　　.

MATTEO: What's the matter?

LUBKING: Nothing.

MATTEO: You're sure?

LUBKING: I'm positive.

MATTEO: I don't want to be getting set up here too.

LUBKING: No. Don't worry about it.

MATTEO: I'm worrying about it. Okay?

LUBKING: Okay. Yeah. I want this—I don't—I want this out of the way.

MATTEO: Okay.

LUBKING: That's why I'm nervous. I just want it out of the way.

His fears allayed, Matteo proceeded to give Lubking detailed instructions on how to find the rifle, which was buried under the snow in Matteo's back yard.

MATTEO: Okay. I'm gonna do it. Are you ready?

LUBKING: Uh-huh.

MATTEO: Go in my driveway. Okay. You know how you go down a dirt road and you come to that little tiny bridge?

LUBKING: Uh-huh.

MATTEO: All right. Well, you stop your car and turn your lights off, leave your car running.

LUBKING: Uh-huh.

.　　.　　.　　.　　.

MATTEO: You go onto the right-hand side of the road, the passenger side of the road, and you go down. And on the side of the right, on the side, there's like a cement wall going down into the water.

LUBKING: Uh-huh.

MATTEO: Right next to the cement wall is where it's at, but you got to dig through the snow to get to it.

LUBKING: Okay.

MATTEO: You get out of the car. You go around the front of the car with your lights off and you go to the railing.

LUBKING: The driver's side?

MATTEO: By the passenger's side.

LUBKING: Uh, okay.

MATTEO: You gotta go around the front of the car if you're facing forward.

LUBKING: Uh-huh.

MATTEO: Okay. Go around the—go down the, you know, it's like a steep little incline, an incline going down.

LUBKING: Yeah.

MATTEO: Right on that incline there's like a little cement wall, I believe. And it's right next to that. And it's under the snow, so you gotta, you know, bury it. And make sure nobody sees you do it. Okay? Open the trunk. Throw it in the trunk. Okay. Don't put it in the back of your car. Throw it in the trunk. I don't care how wet it is, through it in the trunk. And then leave, then go put it in your attic. All right? So then nobody will bother you.

LUBKING: All right.

MATTEO: And if anybody asks, you know, you don't have one. Now, when can you do this?

LUBKING: Right now.

The two agreed that Matteo would call Lubking again at 10:00 p.m.

After the conversation ended, police went to Matteo's house with Lubking and searched the backyard for the rifle. Despite Matteo's instructions, however, they were unable to find it. The police and Lubking then returned to Lubking's home and awaited Matteo's call. It appears the police gave Lubking no further instructions at this time. As arranged, Matteo called Lubking again at 10:00 p.m. and police recorded the call:

LUBKING: Yeah?

MATTEO: It's Anthony. What's up?

LUBKING: I couldn't find it. You oughta get—I need more explicit—this is—

MATTEO: What did you say?

LUBKING: I could not find it.

MATTEO: What do you mean you couldn't find it?

LUBKING: Well, you said the bridge.

MATTEO: Yeah.

LUBKING: And there's two bridges there. There's a sewer pipe and there's—

MATTEO: You got to speak up. I can hardly hear you.

LUBKING: There's a sewer pipe.

MATTEO: A big—real, real huge one?

LUBKING: Yeah.

MATTEO: Yeah. It goes under that cement bridge.

LUBKING: Yeah. On the far side, on the—all the way closer to your house?

MATTEO: Okay. You're talking—I'm talking—you drive on the road, right, you're driving on the road.

LUBKING: Right.

MATTEO: And you come to the cement bridge with the two railings on either side.

LUBKING: Pardon me?

MATTEO: Is there two railings on either side?

LUBKING: Yeah.

MATTEO: All right.

LUBKING: That's—that's a stone bridge.

MATTEO: Yeah. That's what I'm talking about.

LUBKING: Oh, okay.

The conversation continued in this vein, as Matteo attempted to explain exactly where he had hidden the rifle and Lubking asked various clarifying questions. The two agreed to speak again later that night or the next evening. After the conversation, police returned to Matteo's property—this time without Lubking—and successfully located the rifle. Both the rifle and the recorded conversations were admitted into evidence at Matteo's trial.

B. *Procedural History*

As noted, following a jury trial in the Chester County Court of Commons Pleas, Matteo was convicted of all charges and sentenced accordingly. The Superior Court of Pennsylvania affirmed his convictions, *see Commonwealth v. Matteo,* 409 Pa.Super. 655, 589 A.2d 1175 (1991), and the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal, *see Commonwealth v. Matteo,* 529 Pa. 663, 604 A.2d 1030 (1992), and Petition for Reconsideration.

On November 30, 1994, Matteo filed a petition for habeas corpus relief in United States District Court for the Eastern District of Pennsylvania. The District Court adopted the Magistrate Judge's recommendation that Matteo's petition be dismissed unless Matteo withdrew two unexhausted claims. After Matteo declined to do so, the District Court dismissed the petition and later denied Matteo's request for reinstatement of the petition.

In September 1996, Matteo's new counsel filed another petition for habeas relief, alleging that his Sixth Amendment right to counsel had been violated by the wiretapping of his two telephone conversations with Lubking. The Magistrate Judge recommended that his petition be denied on the grounds that Matteo's right to counsel had not attached at the time of the telephone calls. The District Court dismissed the petition, but on different grounds, holding that under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), Lubking had not acted as a government agent and the police had not deliberately elicited incriminating information from Matteo. *See Matteo v. Superintendent,* No. 96–6041, mem. op. at 10, 1996 WL 683982 (E.D.Pa. Nov. 25, 1996). We granted Matteo's request for a certificate of appealability; following oral argument before a panel but prior to the issuance of an opinion, the case was listed for rehearing en banc pursuant to Rule 9.4.1 of our Internal Operating Procedure.

*See Matteo v. Superintendent,* 144 F.3d 882 (3d Cir.1998).

## II.  Interpretation of AEDPA

Matteo's argument on appeal is that his Sixth Amendment right to counsel was violated by the state's elicitation of the location of the rifle.  Before addressing the merits, however, we must determine the appropriate standard of review.  Specifically, we must discern the meaning of 28 U.S.C. § 2254(d) (West Supp.1998) as amended by the Antiterrorisim and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214.  The amended section provides, in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of that claim—
>
> (1) resulted in a decision that was contrary t o, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on a n unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West Supp.1998). The proper interpretation of this language has been the subject of much debate, engendering at least three distinct approaches among the federal courts of appeals.  The crux of the debate has been what degree of deference, if any, AEDPA requires a federal habeas court to accord a state court's construction of federal constitutional issues and interpretation of Supreme Court precedent.  Previously, federal habeas courts were not required to "pay any special heed to the underlying state court decision."  *O'Brien v. Dubois,* 145 F.3d 16, 20 (1st Cir.1998) (citing *Brown v. Allen,* 344 U.S. 443, 458, 73 S.Ct. 397, 97 L.Ed. 469 (1953)).  That is no longer the case—the text of section 2254(d) firmly establishes the state court decision as the starting point in habeas review.  But the precise extent of the changes wrought by AEDPA remains to be determined.  Because this is a matter of first impression in our court of appeals, we begin by examining how other courts have interpreted the provisions at issue.

### A.  *Approaches of Other Circuits*

In *O'Brien,* the Court of Appeals for the First Circuit held that AEDPA does not require uniform deference to state court decisions but "restricts the armamentarium of legal rules available to a federal habeas court in evaluating a state court judgment" by "confin[ing] the set of relevant rules to those 'clearly established by the Supreme Court.'"  145 F.3d at 23.  As such, the First Circuit held, AEDPA did not codify the Supreme Court's decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), but "embrace[d] one of its primary goals," namely, preventing federal habeas courts from requiring state courts to act as "innovators in the field of criminal procedure." *O'Brien,* 145 F.3d at 23.  Accordingly, the *O'Brien* approach interprets AEDPA to require a two-step inquiry.  First, under section 2254(d)(1) the federal habeas court "asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim.  If so, the habeas court gauges whether the state court decision is 'contrary to' the governing rule."  *Id.* at 24. Under this formulation, "contrary to" analysis applies only if the Supreme Court has articulated a rule that governs the claim, though factual identity is not required:

> [A]n affirmative answer to the first section 2254(d)(1) inquiry—whether the Supreme Court has prescribed a rule that governs the petitioner's claim—requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim.  To obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome

contrary to that reached by the relevant state court.

We caution that this criterion should not be applied in too rigid a manner. A petitioner need not point a habeas court to a factually identical precedent. Oftentimes, Supreme Court holdings are "general" in the sense that they erect a framework specifically intended for application to variant factual situations. These rules sufficiently shape the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s "contrary to" prong.

*Id.* at 24–25 (citations omitted).

The second step of the *O'Brien* approach is necessary only if no Supreme Court rule governs the petitioner's claim. Then, the federal habeas court is required to determine whether the state court decision involved an "unreasonable application of" clearly established federal law, as determined by the Supreme Court. *See id.* at 24. The writ of habeas corpus should be granted only if the state court decision was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.* at 25 (citing *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997)). Applying this analysis, the *O'Brien* court upheld the state court's decision that the scope of recross examination had not violated the petitioner's Sixth Amendment rights. *See O'Brien*, 145 F.3d at 27.

A different analysis was propounded by the Court of Appeals for the Fourth Circuit in *Green v. French*, 143 F.3d 865 (4th Cir.1998). The *Green* court held that a decision is "contrary to" Supreme Court precedent when "either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue."

*Id.* at 870. The court further explicated the meaning of "contrary to" as follows:

A lower court's decision ... certainly is said to be "contrary to" supreme court precedent when, through the resolution of a question of pure law, that decision reaches a legal conclusion or a result opposite to that reached in a supreme court opinion which addresses the identical question of law. A lower court's decision is likewise "contrary to" a higher court's precedent when that decision correctly identifies the governing legal principle from the precedent but applies that principle to facts that are indistinguishable in any material respect from those on the basis of which the precedent was decided in such a way as to reach a conclusion different from that reached by the higher court. It is also common to characterize a lower court decision as "contrary to" supreme court precedent when that decision applies a precedent in a factual context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is indisputably unjustified, or, conversely, when that decision fails to apply a precedent in a different context to which the precedent's principle clearly does apply.

*Id.* at 869.

Under *Green*, "unreasonable application of" Supreme Court precedent occurs when the state court decision

applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context

for consideration of the principle's applicability).

*Id.* at 870; *see also Davis v. Kramer,* 167 F.3d 494, 500 & n. 8 (9th Cir.1999) (employing a similar analysis). Thus, under this approach "unreasonable application of" clearly established Supreme Court encompasses three distinct scenarios: (1) the state court extends Supreme Court precedent to cover a new factual context in which application of the precedent is unreasonable; (2) the state court unreasonably fails to apply a precedent in a factual context that warrants its application; or (3) the state court applies the correct precedent, but unreasonably in light of the facts of the case before it. Of course, all three scenarios require a definition of "unreasonable"; in the Fourth Circuit's view, the habeas court must inquire whether "the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is reasonable." *Id.*

Yet a third distinct approach has been espoused by the Courts of Appeals for the Fifth, Seventh, and Eleventh Circuits, which interpret AEDPA to require a distinction between pure questions of law, which are reviewed de novo, and mixed questions of law and fact, which receive more deferential treatment. *See Neelley v. Nagle,* 138 F.3d 917, 924 (11th Cir.1998); *Drinkard,* 97 F.3d at 768; *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).[1] As explained by the Fifth Circuit in *Drinkard,* this approach is premised on the view that courts resolve three types of questions: questions of law, questions of fact, and mixed questions of law and fact. *See* 97 F.3d at 767. Section 2254(d)(2) appears to apply solely to questions of fact: it allows habeas relief where the state court decision "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (West Supp.1998). Thus, as these courts read it, section 2254(d)(1) must cover questions of law and mixed questions of law and fact. These courts interpret the "contrary to law" provision as governing questions of pure law and the "unreasonable application of" provision as applying to mixed questions of law and fact. Accordingly, they apply de novo review to questions of pure law, which fall within the "contrary to" clause, and a more deferential standard to mixed questions falling within the "unreasonable application of" clause.

### B. *Analysis*

▮ As several courts have recognized, the text of AEDPA offers little guidance to the courts charged with applying it. *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) ("[I]n a world of silk purses and pigs' ears, [AEDPA] is not a silk purse of the art of statutory drafting."); *O'Brien,* 145 F.3d at 20 (noting that AEDPA is "hardly a model of clarity ... and its standard of review provision is far from self-explicating"). Nevertheless, we must begin our analysis with the words of the statute. *See, e.g., Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Section 2254(d) states that applications for habeas corpus relief "shall not be granted" unless one of the conditions set forth in subsections (d)(1) and (d)(2) is met. 28 U.S.C. § 2254(d) (West Supp.1998). These conditions, as demarcated by AEDPA, are twofold:first, habeas corpus relief is warranted when the state adjudication resulted in a decision that was "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the Supreme Court, *see id.* § 2254(d)(1); second, relief is warranted when the state adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence." *Id.*

---

1. The Seventh Circuit developed the bifurcated approach in *Lindh,* but more recently appears to have abandoned it. *See Hall v.* *Washington,* 106 F.3d 742, 748 (7th Cir.1997); *see also O'Brien,* 145 F.3d at 21 n. 4 (noting the discrepancy between *Lindh* and *Hall* ).

§ 2254(d)(2). Only the first—section 2254(d)(1)—is at issue in this appeal.

■ Consequently, our task is to discern the meaning of the phrases "contrary to" and "unreasonable application of" as used in AEDPA. The two may overlap, but we must attempt to read the statute so that each has some operative effect, *see United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), and we must assume the legislative purpose "is expressed by the ordinary meaning of the words used," *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *see also Green*, 143 F.3d at 870 ("[A]ccording each term its most natural (even if not its only) meaning, results in an interpretation of [AEDPA] most faithful to the plain purpose of the statute.").

As noted, the Fourth Circuit's interpretation of AEDPA attempts to catalogue the situations in which a result might be "contrary to" or an "unreasonable application of" a higher court's precedent. *See* 143 F.3d at 869–70. The *Green* court held that a decision is "contrary to" precedent when "either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue." *Id.* at 870. The court also held that a decision constitutes an "unreasonable application of" the relevant law when it unjustifiably extends the precedent's legal principle to a new context, fails to apply the principle in a context where such failure is "unreasonable," or identifies the correct principle but unreasonably applies it to the facts before it (assuming those facts are not so different as to "constitute a new context for consideration of the principle's applicability"). *Id.* Although we find this analysis insightful, we decline to adopt it as the basis for scrutinizing state court judgments under AEDPA. We believe

that in practice, it will be difficult for a court to determine which, if any, of the foregoing scenarios is implicated in the case before it. In our view, a better analytical framework is provided by the First Circuit in *O'Brien*, which directs federal habeas courts first to identify whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review; and second, only if it has not, to evaluate whether the state court unreasonably applied the relevant body of precedent. *See* 145 F.3d at 24–25.

■ Consequently, we hold that the "contrary to" provision of AEDPA requires a federal habeas court first to identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. Like the First Circuit, we believe this analysis requires "something more than a recognition that the Supreme Court has articulated a general standard that covers the claim." *Id.* at 24. Instead, the inquiry must be whether the Supreme Court has established a rule that determines the outcome of the petition. Accordingly, we adopt *O'Brien*'s holding that "[t]o obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Id.* at 24–25. In other words, it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent.

■ We also emphasize that it is not necessary for the petitioner to cite factually identical Supreme Court precedent. Rather, the critical question is "whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general

federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case." *Id.* at 25.

■ If the federal habeas court determines that the state court decision was not "contrary to" the applicable body of Supreme Court law—either because the state court decision complies with the Supreme Court rule governing the claim, or because no such rule has been established—then the federal habeas court should undertake the second step of analyzing whether the decision was based on an "unreasonable application of" Supreme Court precedent. We agree with the First Circuit's observation that "the 'unreasonable application' clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result." *O'Brien,* 145 F.3d at 25; *see also Neelley,* 138 F.3d at 924 ("[T]he mere fact that a district court disagrees with a state court does not render that state court's decision 'unreasonable'; certainly two courts can differ over the proper resolution of a close question without either viewpoint being unreasonable."); *Hennon v. Cooper,* 109 F.3d 330, 334 (7th Cir.1997) ("[T]he fact that we might disagree with the state court's determination … would not carry the day."). To hold otherwise would resemble de novo review, which we believe is proscribed by the statute. But we depart from the First Circuit in our understanding of what constitutes an "unreasonable application" of clearly established federal law. As noted, *O'Brien* holds that a state court's application of law is unreasonable only if it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." 145 F.3d at 25. This definition seemingly would exclude all but the most implausible of holdings. As a practical matter, we believe its effect would be to render the "unreason-

able application" clause a virtual nullity, as granting habeas relief would require an explicit finding that the state court decision—often, a decision of the state's highest court—was so far off the mark as to suggest judicial incompetence.

We find the same flaw in the standard espoused by the Fourth and Fifth Circuits. As noted, their approach inquires whether a reasonable jurist could reach the result in question. *See Green,* 143 F.3d at 870 ("[H]abeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable."); *Drinkard,* 97 F.3d at 769 ("[A]n application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was correct. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.") We believe a "no reasonable jurist" definition unduly discourages the granting of relief insofar as it requires the federal habeas court to hold that the state court judges acted in a way that no reasonable jurists would under the circumstances. As such, it has the tendency to focus attention on the reasonableness of the jurists rather than the merits of the decision itself. For example, in *Drinkard* one member of the panel dissented from the majority's interpretation of the petitioner's constitutional claim; the court expressly relied on this disagreement as the basis for concluding that the state court's application of the law was not unreasonable. *See* 97 F.3d at 769.

■■ We do not believe AEDPA requires such unanimity of opinion. Nor do we think it entails an examination of whether the jurists responsible for the state court decision are reasonable: such an approach, like that of *O'Brien,* would doubtless lead to the denial of virtually all petitions. Rather, we hold the appropriate question is whether the state court's appli-

cation of Supreme Court precedent was objectively unreasonable. The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief. Furthermore, although AEDPA refers to "clearly established Federal law, 'as determined by the Supreme Court of the United States,'" 28 U.S.C. § 2254(d)(1) (West Supp.1998), we do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable. *See O'Brien*, 145 F.3d at 25 ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue."). Instead, the primary significance of the phrase "as determined by the Supreme Court of the United States" is that federal courts may not grant habeas corpus relief based on the state court's failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed. Thus, in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent.

We believe this interpretation is supported by AEDPA's legislative history, which indicates Congress sought to preserve independent review of federal constitutional claims, but to curtail its scope by mandating deference to reasonable state court decisions. Explaining the "unreasonable application" provision, Senator Hatch, the bill's primary sponsor, stated:

What does this mean? It means that if the State court reasonably applied Federal law, its decision must be upheld. Why is that a problematic standard?

After all, Federal habeas review exists to correct fundamental defects in the law. If the State court decision has reasonably applied Federal law it is hard to say that a fundamental defect exists.

141 Cong. Rec. S7848 (daily ed. June 7, 1995) (statement of Sen. Hatch). Another of the bill's sponsors, Senator Specter, observed that "under the bill deference will be owed to State courts' decisions on the application of Federal law to the facts. Unless it is unreasonable, a State court's decision applying the law to the facts will be upheld." 142 Cong. Rec. S3472 (daily ed. Apr. 17, 1996) (statement of Sen. Specter). These and other statements from the legislative history persuade us that Congress intended to restrict habeas relief to cases in which the state court judgment rested upon an objectively flawed interpretation of Supreme Court precedent. *See also* H.R. Conf. Rep. No. 104–518, at 111 (1996) (stating that AEDPA "requires deference to the determinations of state courts that are neither 'contrary to,' nor an 'unreasonable application of,' clearly established federal law"). As one commentator accurately recounts, in both houses of Congress section 2254(d) "was called a 'deference' standard by every member who spoke on the question, opponents as well as supporters." Kent S. Scheidegger, *Habeas Corpus, Relitigation, and the Legislative Power*, 98 Colum. L.Rev. 888, 945 (1998).

Regarding the objective nature of the standard, we believe our reading comports with pre-AEDPA law in this area, which was governed primarily by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). There, the Supreme Court held that a federal court cannot grant habeas relief to a petitioner based on a rule announced after his conviction and sentence became final. *See id.* at 311, 109 S.Ct. 1060. The Supreme Court has repeatedly recognized that "the *Teague* doctrine 'validates reasonable, good-faith interpretations of existing precedents made

by state courts....'" *O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (quoting *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990)).[2] The test of reasonableness in this context is objective, not subjective: "Reasonableness, in this as in many other contexts, is an objective standard." *O'Dell*, 521 U.S. at 156, 117 S.Ct. 1969 (quoting *Stringer v. Black*, 503 U.S. 222, 237, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992)).

Of course, we recognize that an "objective unreasonableness" test will fail to dictate an obvious result in many cases. But we believe the same would be true under any faithful reading of the statute. Notions of reasonableness abound in the law and are not ordinarily considered problematic, despite their imprecision. *See Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (observing, in the Fourth Amendment context, that "the test of reasonableness ... is not capable of precise definition or mechanical application"), *quoted in Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As the Seventh Circuit recently observed, the "unreasonable application of" standard admits of no *a fortiori* definition: "None of this answers the question when a departure is so great as to be 'unreasonable,' for that questions lacks an abstract answer.... Questions of degree—like questions about the proper use of 'discretion'—lack answers to which the labels 'right' and 'wrong' may be attached." *Lindh*, 96 F.3d at 871. Thus, the imprecision of the "objective unreasonableness" test does not pose an insurmountable obstacle; indeed, we believe it is the intended result of the statutory language.

To summarize, we adopt the First Circuit's view that section 2254(d)(1) requires a two-step analysis. First, the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *O'Brien*, 145 F.3d at 24–25. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an "unreasonable application of" Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

With this analytical framework in place, we turn to the merits of Matteo's petition.

### III. Matteo's Sixth Amendment Claim

Matteo's sole argument on the merits is that the taping, and subsequent use in evidence, of his two telephone conversations with Lubking deprived him of his right to counsel as secured by the Sixth and Fourteenth Amendments to the United States Constitution. The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Relying on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and its progeny, Matteo claims the Pennsylvania Superior Court's rejection of his Sixth Amendment argument was both "contrary to" and an "unreasonable application of" relevant Supreme Court precedent.

■ In *Massiah*, the Supreme Court held that deliberate elicitation of incriminating statements by a government agent, outside the presence of a charged defendant's attorney, violates the Sixth Amendment. Federal agents had secured the cooperation of an informant who agreed to

---

**2.** Although the *Teague* doctrine was supplemented by the passage of AEDPA, *Teague* continues to be applied in its own right. *See,* *e.g., Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (applying *Teague* to a post-AEDPA habeas petition).

let the agents place a radio transmitter underneath the seat of his car. An agent then overheard a conversation between Massiah and the informant, in which Massiah made several incriminating remarks about his drug importation activities. At trial, the agent was permitted to testify as to what he overheard on the radio transmitter, and Massiah was convicted. The Supreme Court overturned his conviction, holding that "the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. 1199. In a subsequent line of cases, the Court developed the *Massiah* doctrine governing the constitutionality of these so-called "secret interrogations." The cases establish three basic requirements for finding a Sixth Amendment violation: (1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a "government agent"; and (3) the informant must have engaged in "deliberate elicitation" of incriminating information from the defendant. *See, e.g., Maine v. Moulton,* 474 U.S. 159, 170–71, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 269–270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). We will review each separately to determine whether the state court's conclusion withstands scrutiny under AEDPA.

### A. Attachment of the Right to Counsel

The Pennsylvania Superior Court did not explicitly address whether Matteo's right to counsel had attached at the time in question. It did, however, analyze whether Lubking acted as a government agent and deliberately elicited information from Matteo. Because such an analysis would be unnecessary if Matteo's right to counsel had not attached, we believe the state court implicitly concluded that it had.

Generally, the Sixth Amendment right to counsel attaches "only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *see also Estelle v. Smith,* 451 U.S. 454, 469–70, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Moore v. Illinois* 434 U.S. 220, 226, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Such proceedings include "formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby,* 406 U.S. at 689, 92 S.Ct. 1877. The right also may attach at earlier stages, when "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both, in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality." *Gouveia,* 467 U.S. at 189, 104 S.Ct. 2292 (citations omitted). The crucial point is that the defendant is guaranteed the protection of counsel from the moment he "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby,* 406 U.S. at 689.

At the time of Matteo's two telephone conversations, which took place on January 29–30, 1988, Matteo had been arrested and incarcerated for over a week. He had retained a lawyer, who ultimately represented him through the trial. Matteo's preliminary hearing took place on February 12, 1988; the district attorney filed an information on March 3, 1988; and the arraignment was held on March 4, 1988. Citing these facts, the Magistrate Judge recommended denial of Matteo's petition on the grounds that his right to counsel had not yet attached. The District Court held otherwise, ruling that the right to counsel had attached but denying the

petition on other grounds. *See Matteo*, at 3.

We hold that Matteo's right to counsel had attached at the time of the telephone conversations. By this time Matteo had undergone preliminary arraignment. Additionally, he "was in custody as a result of an arrest warrant charging him with the murder, and he was, in fact, represented by counsel from the day he surrendered." *Id.* at 2–3. Moreover, both before and after the telephone calls, Matteo was confronted with the organized resources of an ongoing police investigation by agents who were well aware of his legal representation. Under these circumstances, we believe Matteo's right to counsel had attached and he was entitled to the full protection of the Sixth Amendment.

### B. *Lubking's Status as a Government Agent*

The state court concluded that Lubking did not act as a government agent at the time of his two telephone conversations with Matteo. Applying our AEDPA analysis, we first determine whether the Supreme Court has established a rule that governs Matteo's claim. The Supreme Court has not formally defined the term "government agent" for Sixth Amendment purposes. *See Depree v. Thomas*, 946 F.2d 784, 793–94 (11th Cir.1991) ("There is, by necessity, no brightline rule for determining whether an individual is a government agent for purposes of the Sixth Amendment right to counsel."). In its sole case focusing on a determination of government agency, the Supreme Court found the informant was an agent because he was paid and "acting under instructions" from the government. *See Henry*, 447 U.S. at 270, 100 S.Ct. 2183. The Court also cited facts that the informant was ostensibly a mere fellow inmate rather than a trusted friend of the defendant and that the defendant was in custody and under indictment at the time of the alleged elicitation. The Court did not attempt to generalize these factors into a rule defin-

ing government agency for future cases, nor has it revisited them in subsequent cases. Consequently, although our analysis is informed by the facts emphasized in *Henry*, we do not believe the Supreme Court has announced a rule of sufficient specificity to merit "contrary to" review. *Cf. O'Brien*, 145 F.3d at 24 ("[T]he chief question is how specific a rule must be to qualify as dispositive, thus triggering review under the 'contrary to' clause.").

We next focus on whether the state court decision was based upon an objectively unreasonable application of existing law. The lower federal courts have explicated the holding of *Henry* in some detail: in particular, several have held that the existence of an express or implied agreement between the state and the informant is an additional factor supporting a finding of agency: "At a minimum ... there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Depree*, 946 F.2d at 794; *see also United States v. Taylor*, 800 F.2d 1012, 1016 (10th Cir. 1986); *Thomas v. Cox*, 708 F.2d 132, 137 (4th Cir.1983); *United States v. Metcalfe*, 698 F.2d 877, 882 (7th Cir.1983); *United States v. Calder*, 641 F.2d 76, 79 (2d Cir. 1981). Applying this line of cases, the Pennsylvania Superior Court determined that Lubking was not an agent because " 'there was no agreement or prior arrangement between Lubking and the District Attorney or the police; Lubking did not receive any compensation for the information he provided; he had no history of acting as a paid informant; and Lubking went to the police of his own volition after he had initially been contacted by the Defendant on January 28, 1988.' " *Commonwealth v. Matteo*, No. 01158, mem. op. at 10 (Pa.Super.Ct. Feb. 12, 1991) (quoting trial court opinion).

Matteo disputes this conclusion on several grounds. First, he contends the state court erred in finding that Lubking received no compensation or benefit for

his aid to the police. Although it is agreed that Lubking received no monetary compensation, Matteo argues Lubking's decision to cooperate with authorities was motivated by his desire not to become a suspect in the investigation of Calandriello's murder. As such, Matteo claims, the arrangement between Lubking and the police amounted to a "quid pro quo" exchange in which the police agreed not to investigate Lubking in return for his cooperation. Such a quid pro quo—in which the informant receives some type of benefit, even if nonpecuniary, in exchange for assisting the authorities—may constitute evidence of an agency relationship. *See United States v. Brink*, 39 F.3d 419, 423 n. 5 (3d Cir.1994) ("[W]e believe the Court meant that any informant who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant."). As noted, Matteo contends that Lubking cooperated in order to prevent himself from becoming a suspect in the investigation. Whatever Lubking's motivation, the record amply supports the state court's determination that no deal was struck between Lubking and the police. Lubking himself testified as follows:

Q. Now, prior to these calls, did the police make any threats to you?

A. No.

Q. Any promises?

A. Nope.

Q. Did you have any deal with them?

A. No.

Q. Were you paid for cooperating with the police?

A. No.

Q. What if any benefit did you receive [for] helping them?

A. None.

This testimony was corroborated by that of Chester County Detective Carroll, who testified that there was no deal of any kind between Lubking and the police. Furthermore, Detective Lampman, also of the Chester County Detective's Office, testified that Lubking was not scheduled to be interviewed as part of the investigation, thus belying Matteo's argument that Lubking cooperated to deflect suspicion from himself. Nor was there any evidence suggesting that Lubking believed he was a suspect in Calandriello's killing. We will not speculate or infer the existence of a quid pro quo agreement simply because the informant's motives may not have been entirely altruistic. The record shows that Lubking was not a suspect in the crime, had little to gain by cooperating with the investigation, and in fact received no compensation or benefits of any kind. Under these circumstances, we agree with the state court that Lubking neither sought nor received any benefit for his cooperation with the police.

Matteo next argues that Lubking was acting under instructions from the police, a factor identified in *Henry, see* 447 U.S. at 270, 100 S.Ct. 2183, but not relied upon by the state court. Matteo cites the fact that authorities showed Lubking how to use the recording equipment on the phone and directed him not to ask questions or otherwise elicit information from Matteo. We do not believe these instructions are the kind contemplated by *Henry.* The instruction on how to operate the recording device was trivial and does not pose a problem of constitutional dimension. As for the instruction not to elicit information from Matteo, it would be perverse to hold that police informants may not deliberately elicit information and yet to forbid police from notifying potential informants of this fact. In many circumstances, such a holding would preclude police from using informants at all, a result we find untenable. Consequently, we are not convinced by Matteo's argument that Lubking was acting under police instructions.

On the other hand, there is some evidence of an agency relationship in this case. Lubking was not a jailhouse acquaintance, but a trusted friend of Matteo's. *See* 447 U.S. at 270, 100 S.Ct. 2183.

The police therefore knew that Matteo would be relatively more likely to make incriminating statements to Lubking. In addition, Matteo was in custody at the time of the elicitation. *See id.* (examining whether defendant was in custody with formal charges pending when the incriminating statements were elicited). As the Supreme Court has held, "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.* at 274, 100 S.Ct. 2183. The use of an informant in these circumstances "intentionally creat[es] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel," and therefore is significant to a finding of agency. *Id.* At the time of his conversations with Lubking, Matteo had been arrested for murder, preliminarily arraigned, and incarcerated. Certainly, the "special pressures" of custody were present.

On balance, however, we agree with the state court that Lubking was not acting as a government agent at the time of the phone calls. To the extent the issue is a close one, AEDPA directs us to defer to the state court decision. *See O'Brien,* 145 F.3d at 27 ("We regard the question as a close one—but, under AEDPA's newly minted standard of review, the very closeness of the call militates strongly against the granting of habeas relief."). Therefore, we hold the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### C. *Deliberate Elicitation*

■ Under *Massiah* and its progeny, the petitioner also must show "deliberate elicitation" of incriminating statements by the police informant. Matteo argues that Lubking deliberately elicited incriminating statements from him in both the first and second telephone conversations. In the first conversation, Matteo claims, Lubking deliberately elicited information about the location of the gun by falsely telling Matteo he was not working for the police. This falsehood allegedly induced Matteo to tell Lubking where the gun was hidden. Regarding the second conversation, Matteo bases his claim on the fact that Lubking asked several questions about the precise location of the gun: for example, "So it's not in the grass?"; "So it's almost underneath the bridge?"; "Was it frozen?"; and "Was the water frozen when you dropped it?" We must determine whether the state court's decision that these statements did not qualify as "deliberate elicitation" was contrary to, or an unreasonable application of, the relevant Supreme Court precedent.

■■ The Supreme Court has made clear that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Accordingly, a defendant does not prove a Sixth Amendment violation "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* Applying this reasoning, the Court in *Kuhlmann* found no constitutional deprivation where police placed a man who had previously agreed to act as an informant in the same jail cell as the suspect, who then spontaneously made incriminating remarks to the informant. The lesson of *Kuhlmann,* we believe, is that the use of an informant—even surreptitiously and through prior arrangement—does not violate the Sixth Amendment so long as the informant merely listens to and reports the incriminating statements, rather than affirmatively seeking to induce them. *See Brink,* 39 F.3d at 422 (noting that the Sixth Amendment requires an

informant to be no ·more than a passive "listening post"). In this sense, the limitations on police conduct are analogous to those imposed by the entrapment defense, where police may use undercover agents to afford opportunities to break the law but may not affirmatively "originate a criminal design" or "implant in an innocent person's mind the disposition to commit a criminal act." *Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (citing *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932)).

Matteo argues his case is more similar to *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), in which the Supreme Court held the Sixth Amendment forbids "knowing exploitation by the State of an opportunity to confront the accused without counsel being present." *Id.* at 176, 106 S.Ct. 477; *accord Henry,* 447 U.S. at 274, 100 S.Ct. 2183 (holding that the Sixth Amendment forbids · the state from "intentionally creating a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel"). In *Moulton,* however, the informant actively induced the defendant to make incriminating statements by feigning memory loss about the events of the night in question: "Apologizing for his poor memory, he repeatedly asked Moulton to remind him about the details of what had happened, and this technique caused Moulton to make numerous incriminating statements." 474 U.S. at 166, 106 S.Ct. 477. For example, at one point the informant asked "I want you to help me with some dates.... [W]hat night did we break into Lothrop Ford? What date?" *Id.* at 166 n. 5, 106 S.Ct. 477. He also " 'reminisced' about events surrounding the various thefts, and this technique too elicited additional incriminating statements from Moulton." *Id.* at 166, 106 S.Ct. 477.

Similarly, in *Henry* the informant took "affirmative steps" to elicit incriminating information. 447 U.S. at 271, 100 S.Ct. 2183.

In contrast, Lubking's conduct did not approach this level of deliberate elicitation in either phone call. Lubking did not prompt Matteo to disclose the gun's location; rather, Matteo voluntarily called Lubking on January 27 and asked Lubking to retrieve the gun for him, obviously in an attempt to prevent the police from finding the murder weapon. Plainly, it was necessary for Matteo to tell Lubking where the gun was hidden. In fact, the entire purpose of Matteo's calls to Lubking was to enlist his help in locating the rifle, a task that necessarily required Matteo to furnish Lubking with details of the gun's location. Although we recognize that it is unimportant whether Matteo initiated the contact with Lubking, *see Moulton,* 474 U.S. at 174, 106 S.Ct. 477, we believe the voluntariness of Matteo's disclosure is relevant to the issue of elicitation. Furthermore, we note that after being notified of Matteo's initial request, the police merely "listened in" as Matteo provided the information that was essential for Lubking to carry out the task. In the first conversation, Lubking said virtually nothing at all, causing Matteo to grow suspicious and question whether he was "getting set up." This pattern was repeated in the second phone call, as Matteo willingly provided a detailed description of the gun's location and Lubking responded almost .exclusively with monosyllabic rejoinders such as "okay," "yeah," "uh-huh," and the like.[3] The fact that near the end of the second call Lubking asked a few clarifying questions, which were directly responsive to statements Matteo had just made, does not alter the fundamental nature of the exchange between the two men: namely, Matteo enlisted Lubking's

3.. According to appellee's brief, Lubking responded "okay," "yeah," or "uh-huh" 73 times in the first conversation, which lasted 10 minutes, and 32 times in the second, which lasted approximately 5 minutes. Re-

gardless of the precise number of such responses, appellee is correct that both conversations consisted almost entirely of detailed statements by Matteo followed by one-word answers from Lubking.

help to track down the murder weapon and voluntarily provided him with the information necessary to do so.[4]

We are also not convinced by Matteo's argument that deliberate elicitation is proved by Lubking's statements in the first conversation that he was not acting at the behest of police. Although the statements were false, we are aware of no rule suggesting that deliberate elicitation occurs whenever an informant misrepresents that he is not cooperating with authorities. Matteo claims such a principle is established by the following statement in *Moulton*: "By concealing the fact that [the informant] was an agent of the State, the police denied [defendant] the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." *Id.* at 177, 106 S.Ct. 477. But we do not interpret this language to mean that police informants must disclose, if asked, that they are cooperating with the authorities, or else any incriminating statements made to them are excluded by the Sixth Amendment. If that were the case, criminal suspects could easily circumvent all undercover investigative techniques. Rather, "[w]hen an accused voluntarily chooses to make an incriminatory remark in these circumstances, he knowingly assumes the risk that his confidant may be untrustworthy." *Henry*, 447 U.S. at 297–98, 100 S.Ct. 2183 (Rehnquist, J., dissenting).

We agree with the Pennsylvania Superior Court's determination that Lubking did not deliberately elicit incriminating information from Matteo in either phone call. Certainly, we do not believe the state court decision contravened established Supreme Court precedent to the extent that it could be characterized as "contrary to" the applicable body of law. Nor do we find its holding to be an objectively "unreasonable application of" this law. As noted, the

"primary concern" of the *Massiah* doctrine is to proscribe "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616; *Moulton*, 474 U.S. at 177 n. 13, 106 S.Ct. 477 (finding Sixth Amendment violation because the elicitation in that case was " 'the functional equivalent of interrogation' ") (quoting *Henry*, 447 U.S. at 277, 100 S.Ct. 2183 (Powell, J., concurring)). In this case, it was objectively reasonable for the state court to conclude that police conduct did not amount to surreptitious interrogation of Matteo but consisted merely of listening as Matteo voluntarily revealed incriminating information to Lubking. Consequently, we do not believe the state court's decision was contrary to, or an unreasonable application of, the *Massiah* line of cases.

**IV. Harmless Error**

We also note that even if a Sixth Amendment violation had occurred, we would still affirm on the grounds that the state court's failure to exclude the recorded conversations and the gun was harmless. The other evidence against Matteo, although circumstantial, was very strong. The jury still would have been presented evidence that Lubking loaned Matteo a .22 caliber rifle that was never returned and that this rifle was consistent with the type of gun that killed Calandriello. Additionally, the following facts still would have been presented to the jury: Matteo and Calandriello had scheduled a meeting for noon on January 13, 1998; Calandriello left for this meeting and never returned; Calandriello's car and apartment keys were found in Matteo's apartment along with a wad of $100 bills similar to the bills Calandriello told friends he would bring to the meeting with Matteo; Matteo was

---

4. To hold that Lubking's few clarifying questions constituted "deliberate elicitation" under *Massiah* would imply that a Sixth Amendment violation hinged on whether Matteo successfully communicated the rifle's location on the first try. We do not believe Matteo's inability to do so affects the substance of the conversations, both of which make clear Matteo voluntarily disclosed the rifle's location.

picked up by John Stanchina at the Holiday Inn parking lot where the body was soon found; blood consistent with Calandriello's and only 3 percent of the population was found in Matteo's garage; and Matteo's sneaker print was found on the rear bumper of the car containing the body. Under these circumstances, we believe the admission of the conversations and the gun had no " 'substantial and injurious effect or influence in determining the jury's verdict.' " *California v. Roy*, 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We therefore find it unnecessary to decide whether the Pennsylvania Superior Court correctly concluded that the police inevitably would have discovered the gun.

## V. Conclusion

The state court decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Accordingly, the District Court correctly dismissed Matteo's habeas petition.

We will affirm the judgment of the District Court.

BECKER, Chief Judge, concurring.

I agree that the order of the District Court denying Matteo's application for writ of habeas corpus should be affirmed, because, whether the interpretation of AEDPA applied by the majority or the one that I would apply is correct, the decision of the state court that Lubking was not a government agent at the time of the tele-

phone calls and that the incriminating statements were not deliberately elicited by the police cannot be set aside. I also agree that any error was harmless. I therefore join in Parts III and IV of the majority opinion.

I disagree with the majority, however, as to the correct legal standard for reviewing state court decisions under § 2254(d)(1). I believe that the majority's approach, which I see as expanding the availability of plenary review under § 2254(d)(1), fails to ensure that federal habeas courts grant state court decisions the deference § 2254(d)(1) requires. In addition to explaining why I believe that the *O'Brien* standard adopted by the majority is incorrect, I also set forth my reasons for believing that we should adopt instead a modified version of the standard announced by the United States Court of Appeals for the Fourth Circuit in *Green v. French*, 143 F.3d 865 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999).[1]

### I.

The signal difference between the two approaches is the amount of deference they afford to state court decisions. In Green, the court set out an elaborate categorization of cases in which the two parts of § 2254(d)(1) apply. It specified when plenary review under the "contrary to" clause should apply, and when deferential "unreasonable application of" review should apply:

> [A] decision is "contrary to" precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material

---

1. ·The majority rightly rejects the other approach adopted by various courts, exemplified by *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *revd. on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *See also Drinkard v. Johnson*, 97 F.3d 751, 767 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). Under *Lindh*, a habeas court would apply plenary "contrary to" review to purely

legal questions and deferential "unreasonable application of" review to mixed questions of law and fact. The *Lindh* bifurcated standard of review represents an improper reading of § 2254(d)(1), because it is inconsistent with the text and legislative history of § 2254(d)(1). *See O'Brien v. Dubois*, 145 F.3d 16, 22 (1st Cir.1998) (discussing this problem with the *Lindh* approach).

way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue. In contrast, a decision represents an "unreasonable application of" precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).

*Green,* 143 F.3d at 870; *accord Davis v. Kramer,* 167 F.3d 494, 500 n. 8 (9th Cir. 1999) (defining cases in which § 2254(d)(1) would require a grant of habeas relief) (citing *Green* ), *petition for cert. filed,* 65 U.S.L.W. 3570 (Mar. 8, 1999) (No. 98–1427). Thus, under *Green,* where the Supreme Court has established a rule but not specified how it should apply in the specific factual circumstances at issue, a federal habeas court would review a state court decision under a deferential reasonableness standard.

The majority adopts the *O'Brien* standard, under which "[t]he critical question is 'whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.' " Op. at 889 (quoting *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998)). But query what would happen if a Supreme

Court case provided a clear rule, but did not dictate how that rule should apply in particular factual situations? I cannot find an answer to this question in the majority's decision, but as I read *O'Brien,* from which the majority draws its overall approach, the First Circuit would apply plenary review under the "contrary to" standard even where Supreme Court precedent dictates a controlling general rule without applying it to particular facts. *See O'Brien,* 145 F.3d at 24 ("First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is 'contrary to' the governing rule."). Thus, once a court following *O'Brien* finds that Supreme Court precedent dictated the applicable legal rule in a case, the court would engage in plenary review to determine whether, in its opinion, the state court decision correctly applied the precedent, even if the Supreme Court had not indicated how the rule should be applied in similar contexts. This result is facilitated by *O'Brien*'s elastic formulation of the "contrary to" standard.

Of course, where the Supreme Court has indicated how the law should be applied to the facts, a state court decision ignoring the Court's directions is *ipso facto* unreasonable and "contrary to" clearly established precedent. But by proposing to apply plenary review beyond the scope of direct Supreme Court precedent, and leaving the concept of reasonableness out of the first stage of its inquiry, *O'Brien* underemphasizes the deference § 2254(d)(1) requires federal habeas courts to give to state court decisions. This approach gives greater flexibility for the application of plenary review than is available under *Green,* as *Green* would require the habeas court to consider only whether the state court's application of the precedent was reasonable.

A good example of this is an ineffective assistance of counsel claim under *Strickland. See Stevens v. Maloney,* 32

F.Supp.2d 478 (D.Mass.1998). In *Stevens*, the defendant's attorney failed to file a written motion challenging the pre trial use of a photographic array with an eye-witness. In considering the habeas petition claiming ineffective assistance of counsel, the district court, applying *O'Brien*, first concluded that *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets forth a rule directly applicable to the case. *See Stevens*, 32 F.Supp.2d at 481. The court therefore applied "contrary to" review under *O'Brien* and inquired whether the state court decision was correct, not whether it was a reasonable application of *Strickland*. *See Stevens*, 32 F.Supp.2d at 481–82. Under *Green*, by contrast, the district court would have been limited to considering only whether the state court's application of *Strickland* was reasonable, since the Supreme Court has not specified how *Strickland* should be applied to such claims.[2]

This expanded role for plenary review under § 2254(d)(1) in *O'Brien* is inconsistent with the text and legislative history of AEDPA. First, I do not think that it is consistent with a common sense understanding of when a state court decision is "contrary to" clearly established Supreme Court precedent. Under *O'Brien*, a federal habeas court would be able to grant relief under § 2254(d)(1) solely because it disagreed with the state court's application of the appropriate Supreme Court precedent, even though it was a reasonable interpretation of how the Supreme Court would have applied the precedent. I do not think such a reasonable interpretation could fairly be denominated "contrary to" clearly established Supreme Court precedent. As the majority itself recognizes in

the context of the "unreasonable application of" clause, § 2254(d)(1) "does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result." Op. at 889 (quoting *O'Brien*, 145 F.3d at 25).

Furthermore, Congress's express intent in enacting AEDPA demonstrates that the reduced deference *O'Brien* permits is inappropriate. That § 2254(d)(1) requires a habeas court to give deference to reasonable state court decisions where the Supreme Court has not spoken directly to an issue is evident from Senator Hatch's explication of the provision:

> What does this mean? It means that if the State court reasonably applied Federal law, its decision must be upheld. Why is that a problematic standard? After all, Federal habeas review exists to correct fundamental defects in the law. If the State court decision has reasonably applied Federal law it is hard to say that a fundamental defect exists.

141 Cong. Rec. S7848 (daily ed. June 7, 1995). Similarly, Senator Specter recognized that "under the bill deference will be owed to State courts' decisions on the application of Federal law to the facts. Unless it is unreasonable, a State court's decision applying the law to the facts should be upheld." 142 Cong. Rec. S3742 (daily ed. April 17, 1996). Given these statements, I do not think it is appropriate to apply plenary review to state court decisions applying clearly established legal principles in contexts that the Supreme Court has not directly addressed.

---

2. Judge Stapleton's concurrence also provides an example of the problem with the majority's approach. Judge Stapleton, *contra* the majority, would apply plenary "contrary to" review to the state court's decision that Lubking did not deliberately elicit statements from Matteo. Although he reaches the correct result, he does so only because he concludes that, reviewed *de novo*, the state court's con-

clusion was correct. I agree with the majority, however, that the proper framework for analysis in this case is deferential review under the "unreasonable application of" test. Judge Stapleton's concurrence simply demonstrates the ambiguities inherent in the majority's approach, which lead to the lack of deference that I think is inappropriate.

While distancing itself from *O'Brien*'s treatment of the "unreasonable application of" facet of § 2254(d)(1),[3] the majority appears to adopt explicitly *O'Brien*'s treatment of the "contrary to" clause. If the majority is not adopting this aspect of *O'Brien*, it would, I assume, inquire into whether the state court reasonably determined the manner in which the rule should be applied to the particular facts, if it found a Supreme Court rule on point but the Supreme Court had not applied that rule to particular facts. But even so, the fact of this ambiguity, along with the language of the majority, suggests a lower level of deference to state court decisions than is properly required by *Green.*

## II.

In addition to the decreased deference *O'Brien* permits federal habeas courts to give to state court decisions, I think the *Green* approach provides a more useful framework for future federal habeas courts engaged in review of state court decisions under § 2254(d)(1). More specifically, it focuses the habeas court's attention on the precise nature of the issue the state court decided and its relation to clearly established Supreme Court precedent. For example, by focusing on the inquiry whether "through a decision of pure law ... [the state court] decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue," 143 F.3d at 870, the *Green* approach focuses the habeas court's attention on whether the state court decision of a legal issue is properly reconcilable with precedent. Similarly, by focusing on whether a state court "decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability)," 143 F.3d at 870, the rule properly focuses the habeas court's attention on whether the state court reasonably distinguished or failed to distinguish the facts of the case under review from the precedent.

The majority criticizes the *Green* approach for setting out different frameworks for addressing different sorts of questions, contending that this may lead to confusion on the part of federal habeas courts. "Although we find th[e*Green* court's] analysis insightful, we decline to adopt it as the basis for scrutinizing state court judgments under AEDPA. We believe that, in practice, it will be difficult for a court to determine which, if any, of the foregoing scenarios is implicated in the case before it." Op. at 888. Without further explication of this *ipse dixit*, however, I am unsure why the majority thinks the *Green* approach would be difficult to apply. I prefer the *Green* approach precisely because it attempts to provide at least some analytical structure beyond simply restating § 2254(d)(1), as *O'Brien* and the majority do. The rare cases in which it is difficult to determine which of the *Green* categories is relevant are hardly reason for abandoning such a useful framework.

## III.

Although I would apply *Green*, I agree with the majority's application of § 2254(d)(1) to this case, for under either

---

**3.** I agree with the majority that, in the context of the "unreasonable application of" inquiry, the federal habeas court must apply an objective standard, and examine the reasonableness simpliciter of the state court decision. *See* Op. at 889. The definitions of reasonableness that other courts, including *Green*, 143 F.3d at 870, have announced, *see, e.g., Nevers v. Killinger*, 169 F.3d 352, 361–62 (6th Cir. 1999) (relying on *O'Brien, Green* and *Drinkard*), which the majority terms "subjective," require too much deference to state court decisions and therefore are inconsistent with Congress's intent and the case law out of which § 2254(d)(1) arose. Just as the majority rejects this aspect of *O'Brien*, I would decline to adopt this aspect of *Green*.

**902**

*Green* or *O'Brien* the state court's decision was not "contrary to, [nor did it] involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). Therefore, I concur in the judgment of the Court. Judge Nygaard joins in this concurring opinion.

STAPLETON, Circuit Judge, concurring:

I join in Parts I and II of Judge Scirica's opinion, and I agree that (i) Matteo's Sixth Amendment right had attached at the time of his conversations with Lubking, (ii) no violation of Matteo's Sixth Amendment right occurred, and (iii) any error would be harmless. I write separately to emphasize the importance and utility of interpreting AEDPA in light of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and related Supreme Court caselaw.

I.

The court appropriately seeks to read the AEDPA provisions at issue in a manner that "comports with preAEDPA law in this area, which was governed primarily by *Teague*." Op. at 890. Indeed, the overall interpretive approach urged by the *O'Brien* court, and largely adopted here, rests on the notion that AEDPA was conceived in the spirit of *Teague*. *See, e.g., O'Brien v. Dubois*, 145 F.3d 16, 23 (1st Cir.1998) (explaining that § 2254(d)(1) "perpetuates" the teachings of *Teague* and its progeny through a "sort of choice of law provision" that "closely emulates *Teague*."). I agree that a careful consideration of *Teague* and the Supreme Court cases following it should inform our interpretation of § 2254(d). I write separately to emphasize that the *Teague* body of caselaw provides a well-developed analytical frame-

work for determining whether a habeas petition governed by AEDPA should be analyzed under the "contrary to" or the "unreasonable application of" standard of § 2254(d)(1). This initial determination by the habeas court is pivotal, as it represents a decision as to which of two substantially different standards of review should govern its consideration of the state court's determination.

Echoing *O'Brien*, the majority opinion explains that "the 'contrary to provision of AEDPA requires a federal habeas court first to' identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." Op. at 888. The difficulty lies in determining whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review. Although the statute provides little guidance, the *Teague* body of caselaw is particularly instructive in this endeavor.

*Teague* established the general rule that (with narrow exceptions[1]) "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. Under the *Teague* scheme, a habeas court exercises plenary review only insofar as the petitioner seeks relief on the basis of jurisprudence existing at the time the petitioner's conviction became final. If the petitioner either seeks relief on the basis of a "new rule" (i.e., a decision issued after the conviction became final) or seeks relief that would require the habeas court to announce (and retroactively apply) a new rule, *Teague* sharply restricts the habeas court's review. In the interests of "comity, predictability, and finality," *Stringer v. Black*, 503 U.S. 222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), *Teague* requires habeas courts to defer to "reasonable, good-faith interpretations of existing

1. Under *Teague*, the habeas court may also consider a new rule of law in two exceptional circumstances: first, if the rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *Teague*, 489 U.S. at 307, 109 S.Ct. 1060; or second, if the rule "requires the observance of procedures that are implicit in the concept of ordered liberty." *Id.* at 311, 109 S.Ct. 1060.

precedents by state courts, even though they are shown to be contrary to later decisions." *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).

Under *Teague*, the habeas court first must determine whether the relief sought by the petitioner would constitute a "new rule." If it would, the relief is barred and a (reasonable) state decision will stand; if, on the other hand, the relief sought is sufficiently within the scope of then existing jurisprudence to be considered "dictated by precedent," *Teague* permits the habeas court to grant the relief. Like this "new rule" inquiry under *Teague*, which considers whether the relief sought is dictated by precedent, the initial inquiry under AEDPA considers whether the relief sought is governed by clearly established Supreme Court law. Under AEDPA, as under *Teague*, the habeas court's plenary review powers exist only if the relief the petitioner seeks is governed by clearly established law. Under AEDPA, as under *Teague*, if the result sought is not "dictated by precedent," the habeas court must defer to the state court's reasonable application of prevailing law. Thus, the analysis under AEDPA of whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review may be guided by the standards already established, under *Teague*, for determining whether the existing precedent (i.e., old rules) govern the petitioner's claim (or, put differently, whether the relief sought would constitute a new rule).

Since *Teague*, the Supreme Court has wrestled repeatedly with the question of when a "rule"—articulated in a case decided after the petitioner's conviction became final—should be considered "new" and thus inapplicable to the (subsequent) petition. In this context, the Supreme Court has explained that "a case announces a new rule when it breaks new ground or imposes a new obligation on the [government]." *Id.* at 301, 109 S.Ct. 1060. In addition, the Supreme Court has explained

that the principles of *Teague* also apply if a petitioner, although relying on an "old" rule, seeks a result in his case that would create a new rule "because the prior decision is applied in a novel setting, thereby extending the precedent." *Stringer*, 503 U.S. at 228, 112 S.Ct. 1130. This analysis is particularly apt here. Put differently, under *Teague*, the Supreme Court directed habeas courts to consider whether the result—either sought by the petitioner through the application of an old rule, or achieved in another case through the establishment of an arguably new rule—was "dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060. *Compare, e.g., Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (new rule would be established where prior case dictated only *what* mitigating evidence the jury must be permitted to hear, and petitioner sought rule—not compelled by prior cases—establishing *how* the evidence must be considered) *with Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (no new rule established where the prior case's rule "emerges not from any single case . . . but from our long line of authority" on the matter and, despite differences in the petitioner's case, the result petitioner seeks "follows *a fortiori*" from the earlier case).

Thus, out of deference to state court decisions, *Teague* requires habeas courts to refrain from judging state determinations according to rules (or results) that were not dictated by existing precedent. Similarly, out of the same concern for state court adjudications, § 2254(d)(1) requires habeas courts to employ a deferential, "reasonableness" standard of review unless the Supreme Court has articulated a rule that, "by virtue of its factual similarity . . . or its distillation of general federal law precepts into a channeled mode of analysis . . . can fairly be said to require a particular result in a particular case." Op. at 889 (quoting *O'Brien*, 145 F.3d at 25). In the latter case, under AEDPA, the habeas

court does not consider simply the objective reasonableness of the state decision, but rather determines whether it was "contrary to" such clearly established Supreme Court law.

The difficult initial inquiry under AEDPA—whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review—is thus guided by the well-developed *Teague* caselaw, which is aimed toward the same end, and in which jurisprudential context Congress enacted AEDPA. *Accord O'Brien*, 145 F.3d at 25 (noting that "[n]ot coincidentally, the Courts pre-AEDPA habeas case law employed this approach in conducting *Teague*'s "new rule" inquiries, and other federal courts have followed this praxis (wisely, we believe) when construing section 2254(d)(1).") (citations omitted). For example, the habeas court must not require the petitioner to point to a factually identical precedent in order to obtain review under the "contrary to" prong, just as, under *Teague*, a petitioner who sought to apply an old rule to a new factual setting was not necessarily barred by *Teague*. As Justice Kennedy has explained:

> "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.... Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."

*Wright v. West*, 505 U.S. 277, 308, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (J. Kennedy, concurring).

## II.

The issue presented in this case—deliberate government elicitation of incriminating statements in the absence of counsel—is one in which the Supreme Court has provided a well-established principle for resolution. Guided by *Teague*, I would analyze Matteo's claim under the "contrary to" prong of § 2254(d)(1) and conclude that the state court's decision was not contrary to clearly established Supreme Court law.

Although no Supreme Court case has addressed precisely the facts presented here, *Massiah* and subsequent cases illustrate the fact-dependent nature of the *Massiah* rule. After *Massiah*, in which statements made in a car by a defendant not in custody were "deliberately elicited" in violation of the Sixth Amendment, *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) established that statements made in a cellblock to a paid informant were impermissible under the same theory. Subsequently, *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) established that the same rule applied to surreptitiously recorded statements between codefendants, and *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) drew the line at statements wholly volunteered with no hint of elicitation. In other words, each case in this line embellished the *Massiah* rule with new factual predicates.

Regardless of whether *Henry, Moulton* or *Kuhlmann* established a new rule when each was decided, given the constellation of factual settings and commentary these cases now provide, coupled with the necessarily fact dependent nature of the analysis, the application of this line of cases to Matteo's claim would not, in my view, result in a new rule under *Teague*. The facts of this case are not sufficiently different from those in the *Massiah* line of cases to require an extension or modification of the legal principles set forth in that caselaw. As such, drawing on *Teague*, I conclude that the *Massiah* caselaw "governs" or "dictates" a result in *Matteo*, thus triggering "contrary to" analysis under § 2254(d)(1).

Having determined that the proper inquiry is whether the state decision is "con-

trary to" clearly established Supreme Court law, I would conclude that neither phone conversation between Lubking and Matteo violated the *Massiah* rule against deliberate elicitation. Although the second conversation contains some direct questions from Lubking as to the location of the rifle, this conversation must be viewed in the context of the first and in terms of its substance, rather than its format. Matteo initiated both conversations for his own purpose—to get Lubking to recover (and hide) the rifle. Lubking was unsuccessful in finding the rifle based on the directions Matteo gave during the first call, and when Matteo called a second time to inquire whether the rifle had been located, Lubking informed him of this fact. Predictably, he volunteered more specific directions in order to assure that his purpose would be achieved. In this context, it would elevate form over substance to give controlling significance to the fact that Lubking asked an occasional clarifying question. Matteo's statements were made on his own initiative, not because they were in response to anything said or urged by Lubking. Lubking's incidental questions were not "affirmative steps" to elicit incriminating information. *Henry*, 447 U.S. at 271, 100 S.Ct. 2183.

Because I would conclude that no deliberate elicitation occurred, I would not reach the issue of whether Lubking's actions were attributable to the state. Finally, I agree that any error was harmless in light of the overwhelming evidence against Matteo.

McKEE, Circuit Judge, with whom Judges SLOVITER and ROTH join, concurring.

I join in Parts I and II of the majority opinion, but I believe that the state court's Sixth Amendment analysis was contrary to clearly established law as decided by the Supreme Court. However, I join in the judgment of the court because I agree that the erroneous admission of the rifle into evidence was harmless in view of the quali-

ty and quantity of admissible evidence that connected Matteo to this murder. I write separately to voice my disagreement with the majority's application of the standard we are adopting. I believe that *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), compels a different resolution of the agency inquiry we must undertake to resolve Matteo's claim. In *Massiah*, the Court held that, absent a valid waiver, a government agent may not "deliberately elicit" incriminating statements from an accused after the right to counsel has attached. In holding that the outcome of the state court's inquiry was not compelled by "clearly established Federal law" I believe we are demanding a level of precision and specificity that is neither required by the language of AEDPA, nor consistent with reasoned use of Supreme Court precedent.

I.

The majority holds that "contrary to" review is not warranted here because there is no Supreme Court case defining the term "government agent." That conclusion illustrates the many problems buried in the analytical minefield lurking beneath the surface of AEDPA. One of the unresolved issues created by AEDPA is the level of specificity the Supreme Court must use in fashioning a rule in order for it to be applied as "clearly established Federal Law" under AEDPA. In resolving that issue we must consider that rules fashioned by the Supreme Court are often intended to reach beyond the confines of the particular case in which the rule was enunciated.

In *Massiah*, the Court announced a specific rule which requires a case-by-case inquiry for determining whether the government has violated a defendant's Sixth Amendment right to counsel. *See United States v. Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) ("The question here is whether *under the facts of this case* a Government agent 'deliberately elicited' incriminating statements from

Henry within the meaning of *Massiah*.") (emphasis added). The Court has repeatedly rejected efforts to distinguish or limit *Massiah*'s applicability. *See eg. Brewer v. Williams,* 430 U.S. 387, 390, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("The circumstances of this case are thus constitutionally indistinguishable from those presented in *Massiah v. United States.*"); *Maine v. Moulton,* 474 U.S. 159, 179, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ("reaffirm[ing] the holding" in *Massiah* after rejecting the state's attempt to limit it and distinguish the case on its facts); *Henry,* 447 U.S. at 271–72, 100 S.Ct. 2183 (rejecting argument that it modified the *Massiah* rule in *Brewer v. Williams* rather than applying it to a new factual setting). Though a court must undertake a specific inquiry into the facts of the case before it, the inquiry is governed by the rule enunciated in *Massiah,* and I believe that rule compels a different outcome here.

In *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the Supreme Court succinctly stated the analysis that is required under *Massiah* and its progeny.

> [T]he State's attempt to limit our holdings in *Massiah* and *Henry* fundamentally misunderstands the nature of the right we recognized in those cases. The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State....[T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation.

474 U.S. at 176, 106 S.Ct. 477.

There are, of course, fact patterns that transcend the parameters that can fairly be said to have been erected by Supreme Court case law. When that situation occurs Supreme Court decisions do not compel a particular result without an extension of a particular principle. *See Kuhlmann v. Wilson,* 477 U.S. 436, 456, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (answering in the negative the question, explicitly left open in *Henry* and *Moulton,* whether the Sixth Amendment forbids admission into evidence of an accused's statements to a jailhouse informant who was "placed in close proximity but [made] no effort to stimulate conversations about the crime charged"). However, this is not such a case.

As the majority notes, the Supreme Court has set forth factors which are "important" in determining whether the *Massiah* standard has been violated. *Henry,* 447 U.S. at 270, 100 S.Ct. 2183. However, the infinite number of ways that investigators and informants can combine to elicit information from an unsuspecting defendant precludes us from establishing any litmus test for determining when an informant is acting as a government agent under *Massiah.* *Compare Brewer,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (police officer gave speech designed to extract incriminating responses from defendant); *with Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (agent was a paid jailhouse informant who was directed not to question the defendant) *and Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (agent was a codefendant out on bail who had "cut a deal" with the government and was directed to engage the defendant). Thus, as the majority points out, the Eleventh Circuit Court of Appeals has noted that "[t]here is, *by necessity,* no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel." *Depree v. Thomas,* 946 F.2d 784, 793 (11th Cir.1991) (emphasis added). *See* Op. at 893. "Contrary to" review cannot be reserved only for those cases that are eerily identical to Supreme Court precedent, and I do not interpret the majority's opinion as suggesting any such evisceration of "con-

trary to" review under AEDPA. *See* Op. at 889.

## II.

The majority's analysis focuses upon the factors which the Supreme Court relied upon in *Henry* in finding a Sixth Amendment violation there. In *Henry,* a paid informant who appeared to be no more than a fellow inmate was acting under instructions from the government to elicit incriminating statements from the defendant while he was in custody. *See Henry,* 447 U.S. at 270, 100 S.Ct. 2183. The majority emphasizes that here, there was no "quid pro quo" exchange between Lubking and the police because Lubking was "not a suspect in the crime, had little to gain by cooperating with the investigation and in fact received no compensation." Op. at 894. However, Lubking believed that his rifle was the murder weapon and he cooperated to "keep himself out of trouble" and to allay his fears about being connected with the murder. App. at 153–54a, 157a, 168a, 269a, 278a, 291a. Lubking said that he contacted his lawyer, after being called by Matteo, "[j]ust to keep my butt clean." App. at 157a. When asked why he agreed to help, Lubking reiterated: "To get my name out of any problems that might have happened. I mean, really, to keep my butt clean." App. at 291a. Although Lubking did not have a "deal" with the government, his motivations make him no less capable of being an agent of the investigating authorities. Lubking was not an uninterested citizen so driven by altruism that he offered to tell police what he knew about the crime they were investigating. To be sure, Lubking was also not a coconspirator or cellmate hoping to win favors from police. However, Lubking's situation is no less analogous to cases where the Court has found an agency relationship. Rather than being paid, or being assured that his cooperation would be made known to a sentencing judge, Lubking attempted to

assure himself that he would remain "clean" altogether. He had no less incentive to assist the police than one hoping for a reduced sentence, and the police made good use of his offer to assist. *See Henry,* 447 U.S. at 270, 100 S.Ct. 2183.

Nothing in *Massiah* or its progeny suggests that the Supreme Court intended to restrict an agency analysis under the Sixth Amendment as narrowly as the majority's reasoning requires. The fact of an arrangement between the government and the informant pursuant to which "the informant [i]s charged with the task of obtaining information from an accused" can be sufficient to establish the agency required under *Massiah. See Henry,* 447 U.S. at 273, 100 S.Ct. 2183. In concluding that Lubking was not acting as a government agent during either call from Matteo the majority focuses on the instructions the police initially gave Lubking regarding the operation of the recording equipment, and their instructions to not directly elicit incriminating information from Matteo. If that were all that appeared on this record I would agree with the majority's conclusion that there was no agency;[1] but there is more. Matteo made a second call, and Lubking's role during that call was qualitatively different from the role he played during the first call. I believe the majority fails to give sufficient weight to the totality of the *circumstances surrounding* Lubking's recording of the second telephone call. Moreover, both the first and second call came after Chief Deputy District Attorney Joseph Carroll had informed Lubking that "the purpose of the interception was to obtain potential evidence in a prosecution against Mr. Matteo for murder." App. at 169a. Carroll told Lubking that the police wanted to recover the gun which they believed to be the murder weapon, "but in addition I told him we are not only interested in finding the gun, but also recording the conversation." App. at 181a.

---

**1.** If that were the situation there would still be "clearly established Federal law," but the state court's ruling that there was no agency would not be "contrary to" it.

Despite the initial instructions to Lubking to act as a passive listener, Detective Sergeant Michael Carroll subsequently charged Lubking with the task of obtaining more specific directions as to the location of the rifle. The instructions that were given following the initial, unsuccessful search transformed Matteo from informant to .agent. After Matteo's directions in the initial call proved insufficient to direct the police to the hidden rifle, Detective Michael Carroll escorted Lubking back to Lubking's home where Carroll knew Matteo would call a second time to check on the results of the search. Carroll explained his instructions to Lubking as follows:

Q: What if anything did you say to Lubking regarding the second phone call?

Carroll: I told him that I did not want him questioning Mr. Matteo outside the area of direction to where the gun was located. I told him if he could get us more specific directions, that would be helpful. If he wasn't able to get us more specific directions under the narrow area we allowed him to discuss, that that would be all right, also . . .

Q. And you said, and again you have told us this, but you said basically try to get him to be as specific as you can, but stay in that area of facts, don't go outside of those factual areas; am I correct on that?

Carroll: Yes.

App. at .243a, 248a.

Thus, Lubking's efforts to get Matteo to be more specific about where the rifle had been hidden during the second telephone call must be attributed to the government. The government told him to attempt to get Matteo to be more specific and that is what Lubking did. Matteo relied upon his relationship with Lubking to respond to Lubking's probing just as police hoped he would.

### III.

This record clearly establishes that Lubking did "directly elicit" incriminating information from Matteo, and I believe the state court's conclusion to the contrary is "contrary to" the conclusion that is required by *Massiah, Henry,* and their progeny. Lubking, no less than the informant in *Henry,* was more than a "listening post" during the second phone conversation. The following exchange occurred during the second telephone call:

Matteo: It's Anthony. What's up?

Lubking:I couldn't find it. You oughta get—I need more explicit—this is—

Matteo: What did you say?

Lubking: I couldn't find it.

Matteo: What do you mean you couldn't find it?

Lubking: Well, you said the bridge.

Matteo: Yeah.

Lubking: And there's two bridges there. There's a sewer pipe and there's—

. . . . .

Matteo: Yeah. It goes under that cement bridge.

Lubking. Yeah. On the far side, on the side all the way closer to your house?

. . . . .

Lubking: . . . I looked there too, but they—is it in the water?

. . . . .

. . . So it's not in the grass?

. . . . .

. . . So it's almost underneath the bridge?

. . . . .

. . . Was the water frozen when you dropped it?

App. at 141a–147a. Unlike the first conversation where, as the majority states, Lubking said "virtually nothing at all" in response to Matteo's directions, *see* Op. at 896, Lubking took "affirmative steps" during the second conversation to elicit infor-

mation about the exact location of the rifle. *See Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616 (defendant may establish a constitutional violation by "demonstrat[ing] that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."). These questions were more than "a few clarifying questions." Op. at 897. They were pointed inquiries prompted by Detective Carroll's need for more specific information. In *Henry,* the Court stated: "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." 447 U.S. at 274, 100 S.Ct. 2183. Here, all that is necessary is to substitute "Matteo" for "Henry." Lubking's "monosyllabic rejoinders," Op. at 896, during the second conversation cannot transform his role into that of a listening post. Indeed, insofar as the location of the rifle was concerned, he was more of an interviewer.

Nor am I persuaded by the majority's attempts to distinguish this case from *Moulton.* Given the circumstances here, it is immaterial that Matteo voluntarily called Lubking. *See Moulton,* 474 U.S. at 174–75, 106 S.Ct. 477 (noting that "the identity of the party who instigated the meeting at which the Government obtained incriminating statements [is] not decisive or even important"). The fact that Matteo sought to discuss the location of the gun does not preclude a finding that the information was surreptitiously obtained. As the Supreme Court noted in *Moulton,* once the government is aware that the sole topic of discussion between the agent and the accused is going to be the pending charge, "a Sixth Amendment violation[i]s inevitable." *Id.* at 177 n. 14, 106 S.Ct. 477. Here, as in *Moulton,* the government "knowing[ly] exploit[ed]" an opportunity to confront Matteo in the absence of counsel in violation of his Sixth Amendment rights. *Id.* at 176, 106 S.Ct. 477.

## V.

I applaud the majority's efforts to extract a workable standard from this inartfully drafted statute even though I disagree with the majority's conclusion. The Supreme Court's metaphorical retort that AEDPA is not exactly a "silk purse," *see* Op. at 887, is all too accurate. The difficulty of interpreting this statute is evidenced by the number of competing interpretations given the statute by the courts of appeals that have interpreted it, as well as by the divergent views expressed here. Although it is not implicated here, I cannot help but express concern that such an elusive and inartful statute will often be the basis for deciding if someone was "properly" sentenced to death in a state court. Given the divergent interpretations of this statute one can only hope that Congress will clarify its intent, or that the Supreme Court will provide a single explanation of it.

However, that day is not yet here and, as noted above, that problem is not implicated here. I am convinced that the state court's holding in this case was "contrary to" the "clearly established" rule of *Massiah.* However, I concur in the judgment of this Court because the resulting error was harmless.

RENDELL, Circuit Judge, Concurring.

I concur in the result we reach in this case, because the somewhat different analysis I propose, and the variation on the test I advocate, would nonetheless lead to the same result in this case—affirmance of the District Court's denial of habeas relief.

I caution, however, that our analysis of the standard, as applied to the facts of the case, may well consider too casually the entire AEDPA test and, in dealing with the issues, lose the necessary focus. I also part ways with the need to define "unreasonable application" as we do in the majority court's opinion.

I suggest we adhere closely to the statutory dictate that the threshold through which review must pass is clearly established Supreme Court precedent. Only if the Supreme Court has ventured into a pertinent area of the law that formed the basis for the state court's decision or reasoning do we have the power of review. As a practical matter, using this as a starting point, we can, as here, eliminate many of an appellant's contentions at the outset. I note that while I hesitate to critique a colleague's thoughtful analysis, I think we need to endorse an approach that is clear and easy to apply, so as to give guidance to the lower courts in this area.

As we indicate at the outset of the majority opinion, we must determine whether "the adjudication of the claim (by the state court) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." The inquiry, therefore, should begin by identifying what the state court decided and what, if any, clearly established federal law, as determined by the Supreme Court of the United States, has a bearing on the decision rendered by the state court. We may act only if the state court's decision is either contrary to or involved an unreasonable application of clearly established Supreme Court precedent.

In the instant case, clearly *Massiah* and its progeny have a bearing on the outcome. What clearly established principles that are set forth in the *Massiah* line of cases bear on the decision reached by the state court? I suggest that even though the state court determined that Lubking was not an agent because he was a volunteer and there was no agreement or "quid pro quo" for the information he gave, we needn't dwell on the issue of agency. Although the majority opinion discusses the

agency relationship involved in the *Henry* opinion, the Supreme Court has made no pronouncement, in *Henry* or in any other decision, as to when an individual is or is not an "agent" under this line of cases. Its statement in *Henry* that the combination of circumstances—namely, a paid informant pretending to be a fellow inmate—was "sufficient to support" the court of appeals' determination that the individual was an agent for the government hardly equates to clearly established Supreme Court precedent on this issue.[1] *See United States v. Henry*, 447 U.S. 264, 270–71, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The majority opinion correctly notes that the concept of "clearly established federal law, as determined by the Supreme Court of the United States" requires that we not entertain habeas corpus relief based on the state court's "failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed." If we lose sight of this requirement in our analysis, we stray from the dictates of the statutory language, and I submit that the resulting inquiry into "contrary to" and "unreasonable application" can easily lead to a form of plenary review. Therefore, since the Supreme Court has not addressed the issue of the parameters of agency for purposes of *Massiah*, there is no federal law as determined by the Supreme Court on this issue, let alone any "clearly established" law. Even if a determination of the state court as to agency were pivotal in its adjudication and its decision, we need not examine this aspect, because the Supreme Court jurisprudence on the issue is nonexistent.

Clearly, the issue in *Massiah* and its progeny that has bearing on this case is the question of what constitutes "deliberate elicitation." We must, therefore, ask, first, what is the federal law as determined by the Supreme Court regarding this is-

---

1. Even in *O'Brien* the court noted that the Supreme Court pronouncement should set a "governing rule" or "erect a framework specifically intended for application to variant factual situations." *O'Brien v. Dubois*, 145 F.3d 16, 24–25 (1st Cir.1998). The Supreme Court has not done this in the agency context.

sue, and, assuming the Supreme Court has addressed it, determine whether the law is "clearly established." The Supreme Court has in fact "erected" the necessary "framework" in the case law. We then position the state court's decision alongside the Supreme Court precedent, to determine if the decision itself is "contrary to" the dictates of that precedent, and, if not, whether the adjudication of the claim involved an "unreasonable application" of the precedent.[2] I reach the same result as the majority opinion by proceeding in this fashion in this case because the Supreme Court has established the framework, and the state court's decision was neither contrary to it, nor an unreasonable application of it. I suggest that the *focus on Supreme Court precedent and the pointed inquiries is the essence of the narrower review envisioned by the statute, and will prevent us from venturing into the forbidden area of whether we agree* with the state court decision—which the majority opinion seems to do as it works through the elements, and, indeed, *at the conclusion of its analysis.*

In addition, unlike the majority, I would embrace the statutory language regarding "unreasonable application" as the standard and decline, as we and most other circuits have done, to dwell on interpreting it, for as we redefine it, it loses its meaning. I read the statute as permitting us to examine whether the state court, as it applied the Supreme Court precedent to the case at hand, applied the law in an unreasonable manner. This may well be different from asking whether the outcome reached by state court "cannot reasonably be justified," or the outcome is not "objectively reasonable." (In fact, I even view these two standards employed in the majority opinion as somewhat different from each other.) If it is not different, why the need to interpret it further?

The statutory test is whether the adjudication that resulted in the decision "involved an unreasonable application," and I suggest that this says it all.[3] The majority opinion has, as have other circuits, imposed a negative spin, namely, that *no* jurist would disagree, or debate, or that an outcome *cannot* reasonably be justified, whereas the language does not require or

---

2. I submit that a more focused look at whether the precise issues have been addressed by the Supreme Court, and, if so, a comparison of the Supreme Court dictates in order to answer the "contrary to" question, might well reduce the concerns expressed by Chief Judge Becker as to the potential for expansive, plenary review at this stage. While I agree with our preference for the standard wherein we ask what does the Supreme Court's pronouncement require or dictate, as opposed to the standard requiring near identicality, if we zero in on particular pronouncements by the Supreme Court that are clearly established, I wonder whether the result of the exercise we engage in will be all that different under one or the other.

3. We could debate at length whether and to what extent the discussions of *Teague* in recent Supreme Court cases should influence our view of the statutory language. *See Wright v. West*, 505 U.S. 277, 290–94, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); 505 U.S. at 303–05, 112 S.Ct. 2482 (O'Connor, J., concurring); 505 U.S. at 306–09, 112 S.Ct. 2482 (Kennedy, J., concurring); 505 U.S. at 311–

13, 112 S.Ct. 2482 (Souter, J., concurring); *Butler v. McKellar*, 494 U.S. 407, 412–16, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); 494 U.S. at 417–22, 110 S.Ct. 1212 (Brennan, J., dissenting); *see also Teague v. Lane*, 489 U.S. 288, 308–14, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). I only note that Congress, presumably aware of the numerous ways in which to describe the confined nature of the inquiry as set forth in *Butler v. McKellar* and *Wright v. West*, nevertheless employs the term "unreasonable application," not "patently" or "clearly" unreasonable, with no reference to good faith or debate by reasonable jurists. *Cf.* 141 Cong. Rec. S7803–01, S7836, S7844 (daily ed. June 7, 1995) (remarks of Sen. Biden regarding significance of *Wright v. West*); 141 Cong. Rec. S7803–01, S7878–79 (daily ed. June 7, 1995) (remarks of Emergency Committee to Save Habeas Corpus, reproduced in the Congressional Record). In a departure from the more convoluted route taken by other courts of appeals, the Ninth Circuit Court of Appeals has taken a straightforward reading of the terms included in section 2254(d)(1). *See Davis v. Kramer*, 167 F.3d 494, 500 (9th Cir.1999).

compel this. If anything, "objectively unreasonable"—as used at the end of the majority's analysis—comes closer to the mark than does "cannot reasonably be justified." However, we have adopted the latter as the standard. I would leave the door open for the federal courts to do exactly what the statute dictates, namely, to determine whether the adjudication involved an unreasonable application. I think any attempt to define the phrase in more absolute terms impermissibly rewrites the statutory language.[4] I would suggest further that by the use of the word "application," the statute invites us to look at the reasoning process, rather than merely answering yes or no as to whether the result can be reasonably justified.[5] I would, therefore, adopt an approach to "unreasonable application" whereby the federal courts examine the footing or basis in reason of the state court ruling as an extension of Supreme Court law. Only if it is unreasonable, is it disturbed.[6] I see this as different from determining whether the outcome reached by the state court cannot reasonably be justified. Rather, "unreasonable application" conjures up a different inquiry that tests whether the state court's reasoning is or is not sound.

4. In fact, it is curious that the other courts of appeals concentrate on other jurists' agreeing, or not agreeing, and we talk in terms of "objective reasonableness" and "justification," yet the statute uses the word "unreasonable," the dictionary definition of which is, "not governed by reason" or "going beyond reasonable limits." Websters II New Riverside University Dictionary 1265 (1988). These are very different concepts.

5. Nor should we lose sight of the fact that the AEDPA standard requires that we examine whether the state court *decision* was "*contrary to*," or whether the *adjudication* that resulted in a decision *involved* an "unreasonable application" of Supreme Court precedent.

6. It is at this point—when we examine the reasoning process—that we consider the views of lower federal courts.

To those who would argue that our ability to correct flawed state court reasoning violates the deference intended to be given to state court rulings, I would answer that the statutory standard is extremely deferential, even as I propose to constitute it. Congress has said that we can grant relief *only* if the Supreme Court has addressed a specific area, and then *only* if the law is clearly established, and then, *only* if the state court has disregarded the law or has engaged in flawed reasoning in applying it. This is, in fact, deferential.[7]

7. Interestingly, the floor debates do not support a narrow reading of the concept of "unreasonable application." Both sides of the aisle appear to have viewed it as meaning that unless the state "improperly appl[ied]" clearly established Supreme Court law, the state decision would stand. Senator Hatch, one of the bill's sponsors, incorporated these very words in his explication of the law. *See* 141 Cong. Rec. S7803–01, S7848 (daily ed. June 7, 1995). Another reading of the language was set forth by Senator Biden, who read the proposed provision as requiring deference if the "court decision could be described by a lawyer as being reasonable," and claimed that "unreasonable application" was so limiting as to deprive the federal courts of their power. *See* Cong. Rec. S7803–01, S7841 (daily ed. June 7, 1995). At the least, these views do not support a need for further definition or restriction of the statutory language.